TYLER DAHLSTRAND,

      Plaintiff,

      v.

FCA US, LLC, et al.,

      Defendants.

No. 15 CV 7603

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Tyler Dahlstrand tripped on a piece of plywood while working on a truss reinforcement project at Chrysler's plant in Belvidere, Illinois. Dahlstrand (an ironworker for one of Chrysler's contractors, Midwest Steel, Inc.), brings this common law negligence suit against Chrysler, Coatings Unlimited, Inc. (the painting contractor for the project) and Alberici Industrial, LLC (Chrysler's regional construction management company). Chrysler, Coatings, and Alberici move for summary judgment.

## I.  Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). The moving party is also entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.  Facts

Defendant Fiat Chrysler Automobiles (formally, "FCA US LLC") hired third-party defendant Midwest Steel, Inc., to perform truss reinforcement at Chrysler's plant in Belvidere, Illinois. [132] ¶ 10.[1] Plaintiff Tyler Dahlstrand, an employee of Midwest, worked on the truss reinforcement project as an ironworker. [132] ¶¶ 48, 56.

Dahlstrand's work required welding overhead plates and truss joints. [130-9] 39:1–7; 42:19–21. To access those plates and joints, Dahlstrand and other ironworkers placed ladders on top of an elevated screen guard walkway. [132] ¶¶ 35–36. *See also* [140-5] at 2. The screen guard was made of a welded material that was "spongy" (workers would sink down and "bounce" as they walked along it), [130-9] 55:4–13; 83:11–18; 84:19–23, and the ladders would shift if they were placed directly on top of it. [132] ¶ 35. To solve this problem, Midwest provided its employees with sheets of plywood that could be placed underneath the ladders for additional stability.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Chrysler's Local Rule 56.1 statement, [132], Dahlstrand's response thereto, [139], and Chrysler's reply in support of its Local Rule 56.1 statement. [142]. I also accept as true uncontested factual allegations in defendant Alberici Industrial, Inc.'s statement of uncontested facts. [128-8].

[132] ¶¶ 35–36. Midwest also provided fire blankets to place over the plywood to protect Chrysler's property from sparks that fell as the welding went on overhead. [132] ¶ 29.

Dahlstrand tripped and fell on a piece of plywood that was hidden under a fire blanket while walking along the screen guard. [130-9] 77:6–19; 83:11–86:3; 136:5–8. He had just descended a ladder and was walking on top of some fire blankets spread out along the walkway when his foot sank into the screen guard and his toe caught under the lip of a hidden piece of plywood. [130-9] 74:3–77:19; 83:11–18; 84:8–85:4; 89:16–90:10. Dahlstrand does not know who placed the plywood that tripped him, [132] ¶ 65, or who placed the fire blankets that obscured that plywood from view, [132] ¶ 67, but says that someone told him that the "painters put [the plywood] there to cover a couple -- or cover a hole or something on the screen guard." [130-9] 86:13–20. Dahlstrand landed on his back and was injured. [130-9] 96:4–12.

Chrysler says it neither had the power to tell, nor in fact told, Midwest how to perform its work. [132] ¶ 72. It says that Midwest "was responsible for setting the fire blankets and plywood," that Midwest "used its own process for setting up fire blankets and plywood," and that Midwest let its ironworkers decide where to place the blankets (and then let them place the blankets themselves). [132] ¶¶ 31–32, 34; [142] ¶ 32.

There is testimony to this effect. Robbie Williams, one of Midwest's general foremen, says that Chrysler did "not tell [Midwest] how to do [Midwest's] job" and did not tell Midwest how to lay down the fire blankets or place the plywood. [130-8] 8:20–

3

9:15; 61:17–62:10. Marc Galassi, an ironworker for Midwest, says that Chrysler never supervised him personally, or gave him any direction during the project, and that he never saw Chrysler provide such supervision or direction to anyone else, either. [130-6] 14:13–20; 91:22–92:9. *See also* [130-7] 36:21–24 (Anthony Coluzzi, another of Midwest's ironworkers, testifying to the same effect as Galassi); [130-13] 9:3–6; 84:14–22 (Kyle Bauch, the Belvidere facility fire manager for Chrysler, testifying that he did not tell Midwest how to perform its work); [130-12] 10:4–11:7; 93:3–8 (Darla Franklin, the United Automobile Worker's health and safety representative in Chrysler's safety department, testifying that she did not manage or supervise Midwest's workers); [130-5] 13:5–9, 104:11–105:4 (Garth Gruno, a superintendent for Midwest, testifying that he had "never seen a [Chrysler] security guard get . . . detailed" enough to say, "hey, you need to put fire blankets here").

Dahlstrand, however, says that Chrysler had the power to tell, and in fact told, Midwest how to perform its work. [139] ¶ 72. Dahlstrand agrees that Midwest "set up its work area," including the "fire blankets and plywood on the screen guard," *see* [139] ¶¶ 38–39, but says that Chrysler could require that Midwest place additional blankets and could dictate to Midwest what areas needed to be protected by welding blankets and whether tripping hazards needed to be removed from a work area. [139] ¶¶ 32, 38–39.

There is testimony that lends support Dahlstrand's version of the events, too. Franklin says that, if Chrysler observed anyone working unsafely, Chrysler would "stop the work and have them correct it immediately," [130-12] 30:20–31:4, and that

if they refused they would be removed from the premises. [130-12] 31:15–21. Franklin also testified that, with regards to the fire blankets, Chrysler would make sure that the proper permits had been obtained, that someone was there to watch for fire, and that she and other members of Chrysler's safety department would then "look up and make sure there's a blanket." [130-12] 32:24–33:7. With regards to the plywood, Franklin says that Chrysler "required" the use of the plywood because it made the work area "as safe as possible" (presumably, because it stabilized the ladders) even though it also created a limited tripping hazard. [130-12] 102:11–103:9. Bauch says that representatives from Chrysler would have stepped in and stopped Midwest if it had placed the blankets incorrectly.[2] [130-13] 59:2–60:15. *See also* [142] ¶ 43–44 (Chrysler agrees that it had the authority to "stop unsafe conditions and activities that lead to imminent dangers"); [130-6] 82:15–19 (Galassi testifying that that Chrysler had the authority to stop work if the work space was hazardous or dangerous); [130-11] 11:8–12, 60:4–11 (David Malott, Chrysler's site security manager, testifying that Chrysler would not allow contractors to begin working until Chrysler was satisfied that the blankets were placed adequately to contain sparks). *See also* [130-7] 25:6–26:1 (Coluzzi testifying that there were an "excessive amount of fire blankets" at the Belvidere plant).

---

[2] Chrysler repeatedly objected to this testimony (and much of the testimony like it) for lack of foundation. [130-1] 60:5; [130-9] 161:12–16 ("I'll have an ongoing objection to any questions in regard to what Chrysler had the authority to do or not to do"). "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. That objection is sustained, and I consider this testimony (and the testimony like it) only for the witness's perception that Chrysler had the authority to so act, and not as proof of Chrysler's actual authority to so act.

Dahlstrand says that Chrysler had the authority to stop his work and correct him if Chrysler thought he was violating their safety procedures, [130-9] 147:20–148:2, and that, in the past, he had seen Chrysler revoke people's "cards and kick them out" when they violated safety procedures. [130-9] 155:1–11. He also says that Chrysler employees drove around the factory in golf carts asking welders to show them their burn permits, [130-9] 63:8–64:8, and that Chrysler had the authority to stop work until tripping hazards and/or unsafe working conditions were rectified. [130-9] 162:1–5. However, Dahlstrand also said he never saw Chrysler discipline anyone for any unsafe practices during the truss reinforcement project, [130-9] 66:21–67:10; [132] ¶ 60, and that, "with all the rules Chrysler had, they could tell us to do whatever they wanted." [130-9] 160:8–9.

There is also relevant documentary evidence. First, there is the contract between Dahlstrand and Midwest[3], which required that Midwest comply with all of Chrysler's safety requirements, keep safety records, designate a safety representative, and retain competent supervision. [131] at 5; [130] ¶ 5; [130-14] at 5–6, 32. Midwest also agreed to "keep the job site and surrounding areas free from accumulation of waste materials or rubbish caused by operations under the Contract"

---

[3] Chrysler attached to its motion for summary judgment a copy of an unsigned "Bid Package BP-46/Trim Shop Truss Reinforcing" packet, pages 8 through 65 of which appear to be the terms of the contract that the highest bidder would be expected to sign before completing the project. *See* [130-14]. Chrysler described this contract in its motion, [130], and its memorandum in support thereof, [131] at 5, but not in its Local Rule 56.1 statement of facts. [132]. Dahlstrand did not challenge the contract's authenticity (or Chrysler's citation of it) in his responses to Chrysler's motion and Chrysler's Local Rule 56.1 statement. *See* [139]; [140]. Because it appears from context to be a copy of the contract that governed Midwest's relationship with Chrysler, and because Dahlstrand's did not challenge its authenticity, I consider it as evidence of the parties' contractual relationship.

and, "upon specific request by DaimlerChrysler," agreed to "leave all buildings broom clean and remove from and around the job site waste materials, rubbish, tools, construction equipment, machinery and surplus materials." [130-14] at 33.

Franklin also testified that Chrysler's contractors were given copies of Chrysler's safety regulations and that the contractors were not free to disregard those regulations. [130-12] 29:11–30:8; 50:9–52:20. One of Chrysler's safety regulations (titled, "Fall Hazard Control Requirements," which applies to both Chrysler and Chrysler's contractors, [140-2] at 37) sets forth a hierarchy for the management of trip hazards. *See* [140-2] at 37–48. It requires that the "plant manager" preside over the fall hazard program as a whole. *Id*. at 43. "Manufacturing Engineering" is charged with identifying "potential fall hazards in equipment and services covered by procurement specifications" and "shall . . . require vendors to eliminate fall hazards or prevent exposures to same in provided goods and services or show cause why they cannot." *Id*. at 38–39. "Engineering and supervisory personnel" are charged with considering "[w]orker required paths of movement, fall hazards in such paths, and means of continuous fall hazard elimination . . . throughout such paths" prior to allowing work to begin. *Id*. at 39–40. Employees that "work at elevation[s]" are required to "evaluate and control" all "hazards of falling" whenever the task at hand would "allow a worker to fall . . . any distance where the likelihood of a serious or fatal injury exists." *Id*. at 38. The document does not describe how to determine who

qualifies as a member of the many groups (e.g., "supervisory personnel") described therein. *See id.*[4]

Defendant Coatings Unlimited, Inc., employed painters that were removing lead paint from the trusses. [134] ¶ 23; [130-4] 29:11–30:21. Coatings did not provide fire blankets or plywood for its work, *see* [134] ¶ 30; [130-4] 29:8–10, and witnesses say they never saw Coatings's employees use or set up the fire blankets or plywood. [130-4] 31:8–13.

Defendant Alberici Industrial, LLC, was Chrysler's regional construction manager. [128-8] ¶ 21. Alberici had submitted a bid for the truss reinforcement project but was not the low bidder, was not involved with the project, did not provide any equipment or materials for the project, had no work going on in the area of the plant where Dahlstrand was injured, had no ownership interest in the area where Dahlstrand was injured, and had "absolutely no involvement in what means, manner or method was used for the truss reinforcement project." *Id*. at ¶¶ 24, 28–30, 32.

Dahlstrand sued Chrysler in Illinois state court for "construction negligence" (count I), "premises liability" (count II), and "direct negligence" (count III). [1] ¶ 1. Chrysler removed the case to federal court on the basis of diversity jurisdiction. [1] ¶ 6–8, 10–12. Dahlstrand filed an amended complaint adding defendants Alberici, Coatings, and Nordstrom-Samson & Associates, Inc. [17]. Alberici, Coatings,

---

[4] Another document requires contractors to obtain "hot work" permits before performing certain work. [140-2] at 18–20. Although the "supervisor of the department performing the hot work" had the "primary responsibility for the safety performance" of the work, "Plant Security Operations" were "responsible for assuring that hazardous conditions are corrected by the responsible supervision before approving and authorizing the [hot work] to begin." *Id*. at 20.

Nordstrom and Chrysler each filed third-party complaints against Midwest, [54]; [68]; [71]; [77], and then cross-claimed against each other[5] for contribution under Illinois' Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. Ann. 100/0.01 *et seq.* [55]; [67]; [70]; [104].

Nordstrom filed a motion for summary judgment and, after Dahlstrand failed to respond, I granted that motion and terminated Nordstrom. [114]. Alberici, Chrysler and Coatings filed motions for summary judgment. [128]; [130]; [134]. Dahlstrand filed a response addressing only Chrysler's motion. *See* [140]. Chrysler did not respond to Alberici's or Coatings's motions.

## III.   Analysis

### A.      Dahlstrand's Claims Against Chrysler

Dahlstrand's claims are grounded in common law negligence. "The essential elements of a cause of action based on common law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Const. Co.*, 358 Ill.App.3d 865, 873 (1st Dist. 2005). The parties do not dispute that Dahlstrand was injured, nor that his injury was caused by the piece of plywood. *See* [130]; [131]; [140]; [141].

The parties focus on two legal frameworks that assess whether a defendant like Chrysler owes a plaintiff like Dahlstrand a duty of care. Under the first theory

---

[5] Nordstrom cross-claimed against every other party (including Chrysler but not Midwest). [67]. Alberici cross-claimed against Coatings and Nordstrom. [55]. Chrysler only cross-claimed against Coatings. [104]. Coatings filed claims (characterizing them as "counter-claims") against Chrysler, Alberici and Nordstrom for contribution. [70].

("premises liability"), Chrysler owed Dahlstrand a duty if it possessed the land where the injury occurred and knew of (or should have discovered) a dangerous "condition on the land." [140] at 2–4; Restatement (Second) of Torts § 343 (1965). Under the second ("construction negligence"), Chrysler owed Dahlstrand a duty of care if it retained sufficient control over the work being performed. [140] at 4–13; Restatement (Second) of Torts § 414 (1965). The parties' briefing and Dahlstrand's amended complaint also address the general duty of reasonable care owed to all persons. [17] at 6–9; [140] at 4; [131] at 4–6.

###### 1.    *Premises Liability*

When a "plaintiff alleges he was injured by a condition on defendant's property while on the property as an invitee," the Illinois Supreme Court decides "the foreseeability prong of the duty test by reference to section 343 of the Restatement." *LaFever v. Kemlite Co., a Div. of Dyrotech Indus.*, 185 Ill.2d 380, 389 (1998). Section 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965); *Ward*, 136 Ill.2d at 146. Dahlstrand bears the burden of proving at trial that such a relationship existed. *Jordan v. Nat'l Steel Corp.*, 183 Ill.2d 448, 454 (1998).

As Chrysler suggests in its reply, the problem with this framework is that plywood and fire blankets are not "conditions on the land" so much as they are chattels procured and placed on the land by a third-party. *See* [141] at 4–5. The premises-liability framework is ill-suited to situations like this one, where owners are asked to exercise reasonable care to protect workers against "danger inherent in [an] allegedly unsafe work practice." *Recio v. GR-MHA Corp.*, 366 Ill.App.3d 48, 62 (1st Dist. 2006).

For instance, in *Recio*, a worker died after falling off a ladder while carrying shingles to the roof of an apartment complex. *Id.* at 50. His wife's claim for premises liability failed in part because it was "not really premised upon the existence of some dangerous condition on the land, but upon defendants' negligence in exercising control over their independent contractor." *Id. See also id.* at 63 ("even assuming [the maintenance superintendent for defendant] checked on the roofers every 15 minutes, he cannot be charged with knowledge of an unsafe work situation that would take less than a minute to transpire, namely, a roofer picking up a bundle of shingles and starting to climb a ladder with it"). *See also Haberer v. Vill. of Sauget,* 158 Ill.App.3d 313, 315 (5th Dist. 1987) (when plaintiff suffered injury as a result of his employer's failure to provide protective gloves, plaintiff's claim was better analyzed under the framework of construction negligence rather than that for premises liability); *Torres v. Gutmann Leather LLC*, 2014 IL App (1st) 122460-U, ¶ 45 (plaintiff's "premises liability claim is defective because her allegations of negligence are not based upon a

'condition on the land,' but rather on [third-party defendant]'s demolition related *activities* occurring on the land") (emphasis in original).

Dahlstrand has cited no cases that bridge the divide described in *Recio*, *Haberer* or *Torres*, nor provided any other reason that the premises liability framework should apply here, where the injury sustained was the result of a chattel brought onto the land by a third party. Chrysler is entitled to judgment as a matter of law on Dahlstrand's claim that it owed Dahlstrand a duty of care under section 343 of the Restatement. *See* [17] at 4–6 (count II); Restatement (Second) of Torts § 343 (1965).

### 2. *Construction Negligence*

Dahlstrand's second theory of liability is that Chrysler should be liable because it retained control over the work being performed. [140] at 4–12; [17] at 1–4 (count I). Section 414 provides an exception to the general rule that "one who employs an independent contractor is not liable for the acts or omissions of the latter." *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill.App.3d 835, 838 (1st Dist. 1999). It states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965). Generally, whether a defendant retained sufficient control to trigger liability under section 414 is a question of fact. *Wilkerson*, 379 Ill.App.3d at 494. "[S]ection 414 addresses the duty that an employer owes 'to others,' for example, employees of the independent contractor and other third

parties." *Connaghan v. Caplice*, 325 Ill.App.3d 245, 249 (2nd Dist. 2001); *Dailey v. Consol. Stores Corp.*, No. 00 C 3826, 2002 WL 31101672, at *2 (N.D. Ill. Sept. 19, 2002) ("[u]nder Illinois law, the liability of a general contractor or an owner for injury to an independent contractor's employee at a worksite is based upon common law negligence principles," such as section 414) (citing *Connaghan*). While section 414 is "usually . . . applicable when a principal contractor entrusts a part of the work to subcontractors," it is not "exclusively" applicable in that situation. Restatement (Second) of Torts § 414 cmt. b (1965).

The comments to the Restatement establish two types of control, either of which is sufficient to show that a duty existed. *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶¶ 68–69. Under the first type of control ("operative control"), Chrysler may be liable if it "retains control over the operative detail of any part of the contractor's work." *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 47. *See also Carney v. Union Pac. R. Co.*, 2016 IL 118984, ¶ 38 (the amount of control necessary to find liability under section 414 is similar to but less than that required under agency principles and, in that way, "section 414 takes over where agency law ends").[6] If Chrysler retained "the power to direct the order in which the

---

[6] One of Chrysler's arguments is that Dahlstrand should not be entitled to appeal to theories of vicarious liability because Dahlstrand failed to raise those theories in its complaint. [141] at 6 (citing *Carney*, where the Supreme Court of Illinois declined to consider a theory of vicarious liability because the complaint only sought to hold the defendant liable for direct liability under a construction negligence theory. 2016 IL 118984, ¶ 40). But that argument does not resolve the matter because Chrysler would still be liable under section 414 even if it had "retained a control less than that which is necessary to subject" Chrysler to liability under a theory of vicarious liability. *See Carney*, 2016 IL at ¶ 37; Restatement (Second) of Torts § 414 cmt. b (1965).

work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others," it owed a duty to Dahlstrand. Restatement (Second) of Torts § 414 cmt. a (1965).

Under the second type of control ("supervisory control"), Chrysler may be liable if it knew or should have known that the work was being performed in "a way unreasonably dangerous to others," so long as it had the opportunity to prevent the unreasonably dangerous work by exercising the power of control which it retained and failed to "prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others." *Id.* at cmt b; *Calloway*, 2013 IL App (1st) at ¶ 47. A defendant's ability "to stop unsafe work and not permit it to be resumed until done to the satisfaction of the controlling entity" is evidence of such supervisory control, as is evidence of actions taken in contradiction to contractual terms, and evidence that actions were taken that went beyond what was authorized by contractual terms. *See Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill.App.3d 491, 494–97 (1st Dist. 2008) (even though contract "seemingly left" control over the operative details of the work to the independent contractor, summary judgment was inappropriate where the record also included a letter asserting the defendant's authority to stop dangerous work, where other contractual provisions required attendance at safety meetings and compliance with certain safety measures, and where the independent contractor was required to submit site-specific safety plans for approval).

Dahlstrand has produced sufficient evidence to raise a genuine dispute over whether Chrysler had the power to forbid Midwest's work from being done in a manner harmful to others. Restatement (Second) of Torts § 414 cmt. a (1965). Chrysler's fire facility manager says that Chrysler retained the ability to "step in" if Midwest placed the blankets incorrectly, [130-13] 59:2–60:15, and Chrysler's site security manager says that Chrysler would not allow the contractors to start working until the blankets were properly placed. [130-11] 11:8–12, 60:4–11. Chrysler's own safety documents dictated that "[e]ngineering and supervisory personnel" (whether working for Chrysler or its contractors) were to be charged with considering paths of movement and "fall hazards in such paths," and were to be responsible (at least in part) for eliminating those hazards. [140-2] at 39–40. Chrysler has presented evidence to dispute this conclusion, *see* [130-8] 61:22–62:10 (Williams); [130-6] 91:22–92:9 (Galassi); [130-7] 36:21–24 (Caluzzi); [130-13] 84:14–22 (Bauch); [130-12] 93:3–8 (Franklin); [130-5] 104:11–105:4 (Gruno), but disputing this conclusion is not enough to succeed on a motion for summary judgment.

Dahlstrand has also produced sufficient evidence to raise a genuine dispute over whether Chrysler knew (or should have known) that placing fire blankets and plywood across the screen guard presented an "unreasonably dangerous" working condition. Restatement (Second) of Torts § 414 cmt. b (1965). Dahlstrand's testimony suggests that the danger that someone would trip on the plywood was apparent from readily-discernible characteristics of the screen guard walkway; workers' feet sank into the walkway and the unsecured plywood did not. [130-9] 84:19–23. Other

testimony suggests that Chrysler was using too many fire blankets. [130-7] 25:6–26:1. On these facts, a juror could conclude that the working condition was unreasonably dangerous.

Dahlstrand has also produced sufficient evidence to raise a genuine dispute over whether Chrysler had "the opportunity to prevent [the unreasonably dangerous work] by exercising the power of control" which it retained in itself. Restatement (Second) of Torts § 414 cmt. b (1965). The contract between Chrysler and Midwest required that Midwest follow Chrysler's safety protocols, and those protocols required that, upon request and the completion of the project, Midwest "keep the job site . . . free from accumulation of waste materials" and "leave all buildings broom clean." [130-14] at 33. Another binding safety document required that certain individuals "require vendors to eliminate fall hazards or prevent exposures to same" and consider "[w]orker required paths of movement, [and] fall hazards in such paths . . . prior to allowing work to begin." [140-2] at 39–40. Dahlstrand says that Chrysler had the authority to stop work until tripping hazards had been rectified, and that it had removed people from the factory because of their failure to comply with other safety regulations in the past. [130-9] 155:1–7; 162:1–5. Galassi and Malott corroborated this testimony. [130-6] 82:15–19; [130-11] 60:4–11. *See also* [130-13] 59:2–60:15; [130-11] 11:8–12, 60:4–11. Regardless of whether Chrysler had the legal authority to do so, there is evidence Chrysler was in fact preventing the work from being done in ways that it believed presented dangerous working conditions (including working conditions that were dangerous because of tripping hazards). *See Wilkerson*, 379

Ill.App.3d at 494–97. A reasonable juror could conclude from these facts that Chrysler had the opportunity and power to prevent the work from being done in the way that caused Dahlstrand's injury.

Even if Chrysler had the right to stop Midwest's work, Chrysler argues that the right was too "general" to justify liability. [141] at 10. *See* Restatement (Second) of Torts § 414, cmt c. In *Carney*, where the defendant had only "sought to avoid another accident" by "suggesting" a way to perform the work more slowly, and where the defendant was not in "charge of work site safety," the defendant's rights over the contractor were too general to support a duty to the plaintiff. *Carney v. Union Pac. R. Co.*, 2016 IL 118984, ¶ 61. *See also Connaghan v. Caplice,* 325 Ill.App.3d 245, 250 (2nd Dist. 2001) (right not too general where independent contractor was "not free to do the required work in his own way" and where "defendant controlled both the ends and the means of the work"). Even though Chrysler might have such broad control over the project that they could "tell [Midwest's employees] to do whatever they wanted," [130-9] 160:8–9, there is also evidence that Chrysler retained the specific right to (and on occasion actually did) stop all work and remedy the dangerous working condition if they noticed there was a tripping hazard. [130-13] 59:2–60:5; [130-9] 162:1–5; [130-11] 11:8–12, 60:4–11. These powers are specific enough to have enabled Chrysler to order the removal of the object that caused the injury (or order Midwest to cease performing work until it had been removed, or to remove anyone unwilling to comply from the premises); it was not too general to justify a finding of a duty owed to Dahlstrand. There is sufficient evidence from which a reasonable juror

could conclude that Chrysler had a duty to exercise its control over Midwest's work with reasonable care. Restatement (Second) of Torts § 414 (1965).

There is also evidence from which a reasonable juror could conclude that Chrysler breached that duty. There is evidence that Chrysler was regularly patrolling the facility, *see* [130-9] 63:8–64:8; [140] at 12–13, that there were excessive fire blankets strewn about the screen guard, [130-7] 25:6–26:1, and that—although Chrysler had exercised its authority to discipline unscrupulous contractors in the past, *see* [130-9] 155:1–7—Chrysler was failing to discipline such contractors during the truss reinforcement project. [130-9] 66:21–67:10. A reasonable juror could conclude that Chrysler violated its duty to control Midwest's work with reasonable care when it permitted contractors to continue placing fire blankets over plywood despite apparent dangers, or when Chrysler failed to take other proactive steps to prevent such dangerous conditions from arising in the future. Chrysler is not entitled to judgment as a matter of law on Dahlstrand's claims for negligence, insofar as those claims are premised on section 414 of the Restatement (Second) of Torts. Restatement (Second) of Torts § 414 (1965).

### 3. *Direct Negligence and the Duty of Ordinary Care*

Dahlstrand's last theory is that Chrysler is liable under a "direct" theory of negligence. [17] at 6–9 (count III). An employer can be directly liable if the "employer's breach—not simply the employee's malfeasance—was a proximate cause of the plaintiff's injury." *Id. See also Reynolds v. Jimmy John's Enterprises*, LLC, 2013 IL App (4th) 120139, ¶ 27 (unlike a theory premised on vicarious liability, under which

an employer is liable because of actions taken by its employee, "[a] claim of direct negligence 'alleges that the employer was *itself* negligent'") (emphasis in original).

Dahlstrand's direct negligence claim is premised on the theory that Chrysler breached the duty of ordinary care that is owed to all persons, whether "remote" or "unknown." *Widlowski v. Durkee Foods, Div. of SCM Corp.*, 138 Ill.2d 369, 373 (1990); [140] at 4; [17] 6–8. As Dahlstrand suggests in his response, the Illinois Supreme Court applies a four-factor test when determining whether the duty of ordinary care should apply. [140] at 4. Those four factors are: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 21.

The problem for Dahlstrand is that, even if he could establish that Chrysler owed him a duty of reasonable care, he cannot ultimately establish a breach of that duty because, unlike the duties described in sections 343 and 414 of the Restatement, the duty of ordinary care does not include an affirmative duty to act to prevent harms caused by others. *See Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 19. Within the context of the duty of reasonable care, "if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Id.* But outside of the duty created by such a course of action, "individuals . . . do not owe an affirmative duty to protect or rescue a stranger." *Id.*

Here, the action that created the foreseeable risk of injury was the placement of a piece of plywood and a fire blanket on the screen guard walkway. Dahlstrand

might have a negligence claim premised on the duty of ordinary care against the person that left the plywood and fire blankets on the walkway, but he does not have one against Chrysler absent evidence that Chrysler affirmatively caused the plywood and fire blankets to be left there (i.e., engaged in the course of action that created the risk of injury). *See id.* Dahlstrand has not pointed to any such evidence, and Chrysler is entitled to judgment as a matter of law on Dahlstrand's claim that Chrysler is liable under a theory of liability premised on the ordinary duty of care. *See Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶¶ 20–21; [17] at 6–8.

### B. Dahlstrand's Claims Against Alberici and Coatings

Dahlstrand did not respond to either Coatings's or Alberici's motions for summary judgment. *See* [128]; [134]. Dahlstrand has failed to produce evidence from which a reasonable jury could conclude that Alberici owed Dahlstrand any duty of care; there is no evidence that Alberici was aware of the potentially dangerous condition, had any authority (or ability) to control the manner by which Midwest was performing its work, or otherwise had any relationship with Midwest or Dahlstrand that would justify the imposition of liability. Alberici is entitled to judgment as a matter of law on all of Dahlstrand's claims against it. *See* [17] (counts V, VI & VII).

Dahlstrand's amended complaint brings one count for negligence against Coatings. *See* [17] at 9–11 (count IV). The only piece of evidence that Dahlstrand points to in support of his claim against Coatings is Dahlstrand's statement that, after asking why the plywood was there, "someone said the painters put it there to cover a couple – or cover a hole or something on the screen guard." [130-9] 86:13–16.

20

As Coatings points out, this statement is inadmissible hearsay. *See* [134] ¶ 47; Fed. R. Evid. 801(c); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[a] party may not rely upon inadmissible hearsay to oppose a motion for summary judgment"). Dahlstrand's briefing does not support that statement with any other admissible evidence establishing that Coatings was responsible for the plywood or fire blankets. Coatings points out that Dahlstrand said he "never paid attention" to whether anyone from Coatings left fire blankets out, [134] ¶ 13, that Midwest was the only contractor that supplied plywood for the job, [132] ¶¶ 32, 34, and that others testified that Coatings did not use the welding blankets or plywood. [130-4] 31:8–13. Without more, Dahlstrand's argument that Coatings is responsible for the plywood and fire blankets is mere speculation, and "speculation may not be used to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Coatings is entitled to judgment as a matter of law on Dahlstrand's claims against it, too. *See* [17] (count IV).

## IV.    Conclusion

Alberici's and Coatings's motions for summary judgment, [128], [134], are granted. Judgment shall enter against Dahlstrand on his claim against Coatings, and all three of his claims against Alberici. Chrysler's motion for summary judgment, [130], is granted in part, denied in part. Chrysler is entitled to judgment on Dahlstrand's claims against it for premises liability and negligence premised on the ordinary duty of care, but Dahlstrand's remaining claim (for construction negligence) remains pending. A status hearing is set for February 6, 2019 at 9:30 a.m., and the parties should be prepared to address whether judgment should be entered under Rule 54(b) as to any parties or claims.

ENTER:

Manish S. Shah
United States District Judge

Date:  January 16, 2019